# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### September 16, 2008 Session

## STATE OF TENNESSEE v. BRENDA FAYE BREWINGTON AND BRIAN DEWAYNE BREWINGTON

**Direct Appeal from the Criminal Court for Sumner County**
**No. 180-2006     Dee David Gay, Judge**

---

**No. M2007-01725-CCA-R3-CD - Filed January 21, 2009**

---

The defendants, Brenda Faye Brewington and Brian Dewayne Brewington, were convicted of two counts of aggravated child neglect, Class A felonies, and two counts of child neglect, Class E felonies. For their convictions, the defendants each received an aggregate sentence of twenty-five years' imprisonment to be served at 100 percent. On appeal, the defendants raise the following issues: (1) whether the trial court erred in admitting photographs of the victims, and photographs and a videotape of their home; (2) whether the evidence was sufficient to sustain their convictions for aggravated child neglect; and (3) whether the trial court imposed an excessive sentence.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

J.C. McLin, J., delivered the opinion of the court, in which James Curwood Witt, Jr. and Robert W. Wedemeyer, JJ., joined.

Gary M. Williams (on appeal), Hendersonville, TN, and Randy Lucas (at trial), Gallatin, TN, for the appellant, Brian Dewayne Brewington.

C. Jay Ingrum (on appeal), Gallatin, TN, and Charles R. Bobbitt, Jr. (at trial), Hendersonville, TN, for the appellant, Brenda Faye Brewington.

Robert E. Cooper, Jr., Attorney General and Reporter; Cameron L. Hyder, Assistant Attorney General; Lawrence Ray Whitley, District Attorney General; and Sallie Wade Brown, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

## FACTUAL BACKGROUND

The defendants were charged with two counts of aggravated child neglect and two counts of child neglect against their children, all of whom were five years old or younger. The following

evidence was presented at the defendants' trial. Jill Ashworth testified that she was supervisor with Child Protective Services. On December 29, 2005, she received a referral regarding the defendants, which alleged that the defendants were engaged in environmental and nutritional neglect of their children. On January 4, 2006, Mrs. Ashworth and another case worker, Amber Spann, went to the defendants' home. Mrs. Brewington answered the door. After Mrs. Ashworth explained the purpose of the visit, Mrs Brewington became visibly angry and "yelled for Mr. Brewington." Mr. Brewington came to the door. Mr. Brewington told Mrs. Ashworth that he was employed with the Sheriff's Department and allowed the caseworkers inside the home.

Mrs. Ashworth testified that once she entered the living room of the defendants' home, she observed "massive amounts of trash" piled up, including toys, clothes, old food, and a pizza box containing insect casings. She also saw that the defendants' three-year-old son, Bryson, was not clothed and "running through the rooms." After Mrs. Ashworth inquired into the whereabouts of the defendants' other children, she was told that their five-year-old daughter, Katarina, was at school, and Ashley and Madison, the defendants' youngest children, were in their room. Mrs. Ashworth recounted that she had to climb over piles of toys, clothes, and stuff in the hallway in order to reach Ashley and Madison's room. When she saw Ashley and Madison, she observed that they were both lying in separate cribs without sheets, and they were not moving. Mrs. Ashworth observed more stuff piled in their cribs with them. When she approached both children, she could see that their eyes moved back and forth but otherwise they did not move. According to Mrs. Ashworth, Madison, who was eleven months old at the time, looked like a skeleton. Mrs. Ashworth recalled that she asked Mrs. Brewington if Madison had been to a doctor. Although Mrs. Brewington told Mrs. Ashworth that Madison had been to a doctor when she was six months old, Mrs. Ashworth later discovered that Madison had not seen a doctor since birth.

Mrs. Ashworth testified that after she saw the condition of the children and the home, she explained to the defendants the next steps the Department of Children's Services (DCS) would take. At this time, Mr. Brewington became concerned that he would lose his job with the Sheriff's Department. Mrs. Ashworth testified that she made the decision to have Ashley and Madison transported immediately to the emergency room of the hospital. Mrs. Ashworth stated that once they arrived in the emergency room waiting area, Mrs. Brewington put down Madison's car seat and "roaches just came out everywhere." Mrs. Ashworth also noted that roaches crawled out of Ashley's clothes while she was being held. According to Mrs. Ashworth, Madison did not make a sound while being examined. Madison, who was eleven months old at the time of the examination, weighed ten pounds six ounces. Mrs. Ashworth recalled that Madison's birth weight was a little over eight pounds. Mrs. Ashworth stated that Ashley, who was two years old at the time, was also examined. Ashley could not get out of a sitting position when a doctor tried to get her to walk.

Mrs. Ashworth testified that while at the hospital a safety plan was formulated which allowed for reunification of the children with the defendants. However, the safety plan was changed later because of the circumstances of the case. Mrs. Ashworth recalled that the day after the children were removed, she went to the defendants' house to take pictures. Mrs. Ashworth noted that the condition inside the house had not changed. Mrs. Ashworth said that she observed a "lot of mice activity," and

heard rustling noises coming from the piles of trash in the kitchen. After taking a number of pictures, Mrs. Ashworth left the house and called law enforcement authorities because the conditions in the home were so bad. Mrs. Ashworth testified that she had a meeting with the defendants. At this time, Mrs. Brewington informed DCS that she did not think her children needed medical attention. Mr. Brewington continued to voice his concerns about losing his job, filing for bankruptcy, and medical care being too expensive even though he carried insurance for the family. Mrs. Ashworth said she took pictures of Madison. She recounted that Madison had very little hair and what hair she had was dry and brittle. Madison's rib cage was visible and she had very little muscle tone in her back or legs. Madison had difficulty holding her head up.

On cross-examination, Mrs. Ashworth acknowledged that the medical examination for Ashley and Madison took approximately fifteen minutes and the doctor did not prescribe any medication but said they needed food. Mrs. Ashworth also acknowledged that she did not notice any bug bites on the children at the time of the examination.

Sergeant Rickey Troup of the Gallatin Police Department testified that he went out to investigate the defendants' residence after receiving a call from DCS. Sergeant Troup recalled that he talked with the defendants and they did not appear concerned about the well-being of their children. According to Sergeant Troup, the defendants gave him written consent to enter and search their home. Sergeant Troup testified that he took numerous photographs of the home and described the photographs entered into evidence. As Sergeant Troup walked through the house, he observed that various rooms in the house were filled with trash and filth, including bug cocoons, empty beverage cans, used paper plates, dirty clothes, and spoiled food. The floor of the house was not visible because of the trash, and the odor inside was so strong that Sergeant Troup threw up several times in the first five minutes of being inside the house. There were cockroaches and a large number of used diapers containing feces throughout the house. Sergeant Troup noted that he saw a spoiled diaper on top of baby formula.

Sergeant Troup testified that when he entered the kitchen, cockroaches scurried over the overflowing trash. Dead cockroaches, mouse droppings, and spilled and spoiled food were in the refrigerator and throughout the kitchen. Cockroaches were also found in the bathroom, along with dirty rags. Sergeant Troup saw that the bathtub and toilet were covered in mold and mildew. Sergeant Troup also noted that he had to crawl over trash to get to the bedrooms. He observed that the baby beds did not have linens and the lights were not working in the children's bedrooms. He also observed mice in the children's bedrooms. The dresser and walls were covered with crayon drawings. There were nails and screws on the floor and milk jugs containing spoiled and molded milk were on the shelves.

Sergeant Donald Bandy testified that he went with Sergeant Troup to search the defendants' home. He testified similarly to Sergeant Troup regarding the conditions of the defendants' home. Sergeant Bandy noted that he videotaped the investigation of the home while Sergeant Troup took pictures. Sergeant Bandy noted that the odor and sight inside of the house was foul and overwhelming for him. The videotape of the investigation of the defendants' house was entered into

evidence and shown to the jury without audio. Several individuals testified as the custodians of records from the defendants' places of employment. They testified that Mr. Brewington was employed with the Sheriff's Office as a correction officer and had health insurance for his family while Mrs. Brewington was employed at Walmart.

Dolota Pittman testified that she was a former foster care case manager with DCS. She recalled that she originally had the defendants' children removed from the defendants' home and placed them with the children's paternal grandparents. However, later the children were placed in foster care. Mrs. Pittman recalled that Katarina and Bryson were taken to get eye exams and Bryson needed glasses. Mrs. Pittman stated that a permanency plan meeting was held with the defendants present at the meeting. Mrs. Pittman said that adoption was discussed as part of the plan and that the defendants did not appear "overly concerned" with someone adopting their children. However, Mr. Brewington indicated that he was very concerned about losing his job. According to Mrs. Pittman, she was in "shock" when she first saw Madison. Madison did not have any teeth although she was eleven months old and she was wearing newborn diapers and clothes sizes zero to three months. Mrs. Pittman said that she saw a marked difference in Ashley and Madison's health after a month of being in foster care. They both gained weight and appeared happier and friendlier. On cross-examination, Mrs. Pittman acknowledged that she was not aware of any particular health problems the children had when they came into DCS custody. She also acknowledged that the children came into DCS custody on January but the physical examinations were not performed on the children until January 25.

Foster parent Tammy Linerode testified that she cared for the defendants' four children for almost five months following their removal from the defendants' home. According to Mrs. Linerode, Katarina, who was in kindergarten, was "way behind" in class and had a decayed front tooth. Bryson had not received all of his shots. Bryson was delayed and was placed in a special pre-kindergarten program. Bryson's speech was poor, and he was not potty trained. Ashley could barely walk even though she was two years old. She was very "stiff-legged" and preferred to be carried. Ashley had little hair and was thin and "strawy." She was not potty trained. She needed glasses and had to be placed in a speech therapy program because she could not speak. Madison weighed thirteen pounds and had turned one year old when she arrived at the Linerode home. She could barely lift her head or pick up food. Madison had very little hair and she had not received her immunization shots. Mrs. Linerode testified that while the children stayed in her home they made progress. Katarina learned to read and write her name. Bryson "thrived" at school. Ashley started to walk around much more and talked continually. Madison was able to sit and pull herself up. She also gained weight.

Linda Boyers, Executive Director of the Gallatin Day Care Centers, testified that she had to feed Madison with a bottle in contrast to other one year olds who could drink out of "sippy" cups or straws. Madison was very tiny and weak. She could not use her arms and legs. Madison needed extensive care. Mrs. Boyers testified similarly to Mrs. Pittman and Mrs. Linerode regarding Madison's weight, hair, and size. Mrs. Boyers noted that Madison was placed in physical therapy and did not make noises or speak for some time. Eventually she progressed into solid foods, gained

-4-

weight, and became a "miracle baby." Mrs. Boyers testified that when Ashley arrived at the center her teeth were terrible and she had brittle hair. She wore sizes nine to twelve months even though she was two years old and she walked like a one year old. She did not talk and had poor eyesight. According to Mrs. Boyers, Ashley had a "haunted look in her eye" and her stomach could not accept normal food at first. She was initially fearful of having her diaper changed. Josie Davis, another center director, testified similarly as to the children's initial condition at the day care center and the progress made with each child.

Misty Ann Donoho testified that she was Katarina's kindergarten teacher for the school year 2005-06. She recalled that at the beginning of the school year, Katarina was sent home because she had a severe case of lice. Katarina also lacked social and communication skills, was pale, appeared to be tired all the time, and was often dressed in dirty clothes. Mrs. Donoho noted that Katarina was allowed a free breakfast and a discounted lunch at school. Mrs. Donoho said she thought it odd that Mrs. Brewington would stay with Katarina in the morning and share Katarina's breakfast offered by the school. Mrs. Donoho said that she saw a marked difference in Katarina's accomplishments and behavior in school after Katarina was placed in foster care.

Sherri England testified that she worked at the Sumner County Health Department. She recalled that she consulted with the defendants regarding the diets of their children. At the time, the defendants were informed that their children's diets were inadequate as to their nutritional intake.

Dr. David Goldberg testified that he was the emergency room physician when Ashley and Madison were first examined on January 4, 2006. According to Dr. Goldberg, two-year-old Ashley was excessively thin, weak, and developmentally delayed. Ashley's weight had not progressed as it would in a normal two year old. At birth, Ashley weighed eight pounds and five ounces and upon examination she weighed nineteen pounds and five ounces. Ashley had not received all of the typical vaccinations for a two year old. Although Mrs. Brewington maintained that Ashley was fine and not having any problems, Dr. Goldberg's examination revealed that Ashley was not alert and active, and she was not able to walk like a normal two year old. Dr. Goldberg noted that Ashley could sit up and feed herself. Dr. Goldberg diagnosed Ashley with "marasmus," which is a form of starvation where the "proteins in the muscles are burned for energy" because the person is not getting enough food to eat. Dr. Goldberg said that marasmus can lead to death. When asked, Dr. Goldberg agreed that if Ashley had not been fed there was a substantial risk of death.

Dr. Goldberg testified that Madison was missing hair which was uncommon for a normal eleven month old girl. Madison had severe muscle wasting in her legs, thinner than normal arms and legs, protruding ribs, and was underweight. At birth, Madison weighed eight pounds and upon examination she weighed ten pounds and six ounces. Dr. Goldberg found her to be well below normal range of height and weight for children her age. Dr. Goldberg diagnosed Madison with "marasmus" and moderately severe diaper rash. According to Dr. Goldberg, Madison was suffering more severely from marasmus than Ashley and if left untreated her condition would have led to death. Madison could not sit up and was not alert. Dr. Goldberg opined that he expected Madison to have suffered some decrease in her eventual brain function as a result of starvation. On cross-

examination, Dr. Goldberg acknowledged that his examination did not find any other serious medical conditions.

Dr. Victoria Rundus, a pediatrician treating Ashley and Madison, testified that she first saw Ashley and Madison in February of 2006. Based on her review of the medical records, Dr. Rundas expressed the same medical concerns as Dr. Goldberg. According to Dr. Rundus, Ashley and Madison's health issues and delayed development stemmed from not being properly fed. Dr. Rundus said that Ashley and Madison would have died if they continued on the same course of not being fed.

Based on the evidence presented at trial, the jury found the defendants guilty of two counts of child neglect as to Bryson and Katarina, Class E felonies, and two counts of aggravated child neglect as to Ashley and Madison, Class A felonies. Thereafter, the defendants were both sentenced to an aggregate sentence of twenty-five years imprisonment to be served at 100 percent.

## ANALYSIS

### I. Notice of Appeal

Before we address the merits of the defendants' issues on appeal, we must first address the state's argument that counsel for Mrs. Brewington did not timely file her notice of appeal. Rule 4(a) of the Tennessee Rules of Appellate Procedure provides that "the notice of appeal required by Rule 3 shall be filed with and received by the clerk of the trial court within thirty days after the date of entry of the judgment appealed." Mrs. Brewington's appeal arises from judgments entered on June 12, 2007. However, her motion for a new trial was not filed until July 18, 2007. Consequently, the time for the filing of the notice of appeal was not tolled by the filing of her motion for a new trial. *See State v. Dodson*, 780 S.W.2d 778, 780 (Tenn. Crim. App. 1989). "Failure to file a written motion for new trial within the required thirty days not only results in the [defendant] losing the right to have a hearing on the motion, but it also deprives the [defendant] of the opportunity to argue on appeal any issues that were or should have been presented in the motion for new trial." *State v. Martin*, 940 S.W.2d 567, 569 (Tenn. 1997) (citations omitted).

However, a notice of appeal "is not jurisdictional and the filing of such document may be waived in the interest of justice." Tenn. R. App. P. 4(a). Waiver should only occur when "the interest of justice" mandates waiver. *See State v. Scales*, 767 S.W.2d 157 (Tenn. 1989). In the instant case, we note that we must address the aforementioned issues in this case regardless of Mrs. Brewington's procedural default as Mr. Brewington timely filed a motion for new trial and notice of appeal. Accordingly, we conclude that waiving the filing requirement for Mrs. Brewington's appeal serves the interest of justice, and we will address the merits of both Mr. and Mrs Brewington's claims regarding the sufficiency of the convicting evidence and propriety of their sentences. However, we determine that Mrs. Brewington's challenge to the admissibility of the photographs and videotape is waived, and we decline to address the merits of this evidentiary issue on her behalf. *See* Tenn. R. App. P. 4(a); Tenn. R. Crim. P. 52(b).

## II. Admission of Photographs and Videotape

We now turn to the evidentiary issue raised by Mr. Brewington. On appeal, he contends that the trial court erred in admitting photographs of the children, including the "post-improvement" photographs, and the photographs and videotape of the conditions of the defendants' home because the photographs and videotape were cumulative and unfairly prejudicial. In rebuttal, the state points out that Mr. Brewington has waived this issue as it pertains to the photographs of the children because counsel for Mr. Brewington failed to challenged the admission of these photographs in the motion for new trial. The state also argues that the court properly admitted the photographs and videotape of the defendants' home.

Generally, an issue presented for review shall not consist of error predicated upon admission of evidence in a jury trial unless the appellant raises the evidentiary error in his motion for a new trial. Tenn. R. App. P. 3(e). Furthermore, the appellant may not change theories between the lower court and the appellate court. *State v. Alder*, 71 S.W.3d 299, 303 (Tenn. Crim. App. 2001). In the instant case, the record reflects that Mr. Brewington presented in his motion for a new trial the following issue: "That the Court erred in allowing the jury to view the photograph and videotape of the conditions of the Defendant's home in that those photos were cumulative and their prejudicial impact far outweighed their probative value and denied the defendant a fair trial." Therefore, we conclude that Mr. Brewington's issue as to the admission of the photographs of the children is waived, and nothing in the record suggests that he is entitled to plain error review. *See* Tenn. R. App. P. 3(e); Tenn. R. App. P. 36; Tenn. R. Crim. P. 52(b).

We now address Mr. Brewington's challenge to the admission of the photographs and videotape of the defendants' home.

The admissibility of evidence is a matter committed to the sound discretion of the trial court and will not be overturned on appeal without a clear showing of abuse of that discretion. *State v. Porterfield*, 746 S.W.2d 441, 450 (Tenn. 1988). "[T]he modern trend is to vest more discretion in the trial judge's rulings on admissibility." *State v. Leach*, 148 S.W.3d 42, 63 (Tenn. 2004) (citing *State v. Carruthers*, 35 S.W.3d 516, 577 (Tenn. 2000), *cert. denied* 533 U.S. 953 (2001)).

Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. Relevant evidence is generally admissible. Tenn. R. Evid. 402. However, relevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of delay, waste of time, or needless presentation of cumulative evidence. Tenn. R. Evid. 403.

Prior to trial, the defendants filed motions *in limine* to exclude the photographs and videotape of the conditions of their residence. The trial court, after a hearing, allowed the photographs and

videotape at issue to be introduced as evidence.[1]  The trial court found that the photographs were relevant to prove the elements of the offenses charged, specifically neglect and aggravated child neglect.  The trial court further found that the probative value of the photographs and videotape was not outweighed by the danger of unfair prejudice.  Upon review of the record, we agree with the trial court's determination and conclude that the trial court did not abuse its discretion in admitting the photographs and videotape of the conditions inside the defendants' home.

### III. Sufficiency of the Evidence

The defendants next challenge the sufficiency of the evidence as to their convictions for aggravated child neglect for which they received twenty-five years' imprisonment.  Although the defendants concede that the evidence was sufficient to show that Ashley and Madison were suffering from low weight and malnourishment, the defendants contend that the evidence was legally insufficient to establish that Ashley and Madison suffered serious bodily injury which involved a substantial risk of death.  The defendants submit that state witnesses admitted that Ashley and Madison did not require any sort of life saving medical treatment or hospitalization at the time of their removal from the defendants' home.

Our review begins with the well-established rule that once a jury finds a defendant guilty, his or her presumption of innocence is removed and replaced with a presumption of guilt.  *State v. Evans*, 838 S.W.2d 185, 191 (Tenn. 1992).  Therefore, on appeal, the convicted defendant has the burden of demonstrating to this court why the evidence will not support the jury's verdict.  *State v. Carruthers*, 35 S.W.3d 516, 557-58 (Tenn. 2000); *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982).  To meet this burden, the defendant must establish that no "rational trier of fact" could have found the essential elements of the crime beyond a reasonable doubt.  *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *State v. Evans*, 108 S.W.3d 231, 236 (Tenn. 2003); *see* Tenn. R. App. P. 13(e).  In contrast, the jury's verdict approved by the trial judge accredits the state's witnesses and resolves all conflicts in favor of the state.  *State v. Harris*, 839 S.W.2d 54, 75 (Tenn. 1992).  The state is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn from that evidence.  *Carruthers*, 35 S.W.3d at 558.  Questions concerning the credibility of the witnesses, conflicts in trial testimony, the weight and value to be given the evidence, and all factual issues raised by the evidence are resolved by the trier of fact and not this court.  *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997).  We do not attempt to re-weigh or re-evaluate the evidence.  *State v. Reid*, 91 S.W.3d 247, 277 (Tenn. 2002).  Likewise, we do not replace the jury's inferences drawn from the circumstantial evidence with our own inferences.  *Id*.

Relevant to this case, a person commits aggravated child neglect who commits the offense of child abuse, neglect, or endangerment and the conduct results in serious bodily injury to the child.

---

[1] The trial court did not allow the audio of the videotape to be played to the jury.  The audio contained comments and reactions by Sergeant Bandy that the court found to be unduly prejudicial.

*See* Tenn. Code Ann. § 39-15-402(a)(2).[2] Child neglect occurs when a person knowingly neglects a child under eighteen (18) years of age so as to adversely affect the child's health and welfare. *Id*. § 39-15-401(b).[3] Bodily injury includes "a cut, abrasion, bruise, burn or disfigurement, and physical pain or temporary illness or impairment of the function of a bodily member, organ, or mental faculty." *Id*. § 39-11-106(a)(2). Serious bodily injury is defined as bodily injury which involves a substantial risk of death, protracted unconsciousness, extreme physical pain, protracted or obvious disfigurement, or protracted loss or substantial impairment of a function of a bodily member, organ or mental faculty. *Id*. § 39-11-106(a)(34).

Viewed in the light most favorable to the state, the evidence presented at trial established that Ashley and Madison lived in filth and squalor at the defendants' home despite the fact that the defendants were gainfully employed and had health insurance. Upon examination, two-year-old Ashley was found to be excessively thin, weak, and developmentally delayed. At birth, Ashley weighed eight pounds and five ounces and upon examination she weighed nineteen pounds and five ounces. She could not walk like a normal two year old, and her hair was thin and brittle. She was not alert and active. Madison was missing hair which was uncommon for a normal eleven month old girl. Madison had severe muscle wasting in her legs, thinner than normal arms and legs, protruding ribs, and was significantly underweight. She was very thin and weak. At birth, Madison weighed eight pounds, and upon examination at eleven months she weighed ten pounds and six ounces, which was well below the normal range. The defendants had been advised that Ashley and Madison's diets were inadequate. Both Ashley and Madison were diagnosed as suffering from starvation, and Dr. Goldberg and Dr. Rundus testified that Ashley and Madison would have been facing a substantial risk of death as a result of their condition. Accordingly, we conclude that a rational jury could have found the essential elements of aggravated child neglect beyond a reasonable doubt.

### IV. Excessive Sentence

The defendants next contend that the trial court erred in imposing an excessive sentence of twenty-five years' imprisonment to be served at 100 percent. Specifically, the defendants argue that the trial court erred in its application of enhancement and mitigating factors and ignored sentencing principles wherein their effective sentences were greater than that deserved for the offenses committed in this case. The defendants suggest that modification to fifteen years' imprisonment to be served at 100 percent would be more than sufficient to deter similar crimes and promote respect for the laws in Tennessee.

When a defendant challenges the length and manner of service of a sentence, this court conducts a de novo review of the record with a presumption that the trial court's determinations are

---

[2] The offense of aggravated child abuse is a Class A felony if the victim is eight years of age or less. *Id*. § 39-15-402(b).

[3] The offense of child neglect is a Class E felony if the victim is six years of age or less. *Id*. § 39-15-401(b).

correct. Tenn. Code Ann. § 40-35-401(d). This presumption of correctness is conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances. *State v. Pettus*, 986 S.W.2d 540, 543-44 (Tenn. 1999). However, if the record shows that the trial court failed to consider the sentencing principles and all relevant facts and circumstances, then review of the challenged sentence is purely de novo without the presumption of correctness. *State v. Ashby*, 823 S.W.2d 166, 169 (Tenn. 1991). On appeal, the party challenging the sentence imposed by the trial court has the burden of establishing that the sentencing decision was improper. *Id.* § 40-35-401, Sentencing Commission Comments. We will uphold the sentence imposed by the trial court if: (1) the sentence complies with our sentencing statutes, and (2) the trial court's findings are adequately supported by the record. *See State v. Arnett*, 49 S.W.3d 250, 257 (Tenn. 2001); *see also* Tenn. Code Ann. § 40-35-210. If this court determines that the sentence is erroneous, it "may affirm, vacate, set aside, increase or reduce the sentence imposed or remand the case or direct the entry of an appropriate order." *Id.* § 40-35-402(c).

The mechanics of arriving at an appropriate sentence are spelled out in the Criminal Sentencing Reform Act of 1989 and its amendments. The trial court is free to select any sentence within the applicable range so long as the length of the sentence complies with the purposes and principles of the Sentencing Act. *Id*. § 40-35-210; *see also State v. Carter*, 254 S.W.3d 335, 343 (Tenn. 2008) (noting that such principles encompass themes of punishment fitting of the crime, deterrence, and rehabilitation). However, the trial court is required to place on the record "what enhancement or mitigating factors were considered, if any, as well as the reasons for the sentence, to ensure fair and consistent sentencing." Tenn. Code Ann. § 40-35-210(d). Once applied, the chosen enhancement factor becomes a sentencing consideration subject to review under Tennessee Code Annotated section 40-35-401(c)(2). Thus, while the court can weigh enhancement factors as it chooses, the court may only apply the factors if they are "appropriate for the offense" and "not already an essential element of the offense." *Id*. § 40-35-114.

In conducting a de novo review of a sentence, this court must consider (a) any evidence received at the trial and/or sentencing hearing, (b) the presentence report, (c) the principles of sentencing, (d) the arguments of counsel relative to sentencing alternatives, (e) the nature and characteristics of the offense, (f) any mitigating or enhancement factors, (g) any statements made by the accused in his own behalf, and (h) the accused's potential or lack of potential for rehabilitation or treatment. Tenn. Code Ann. §§ 40-35-103, -210; *State v. Taylor*, 63 S.W.3d 400, 411 (Tenn. Crim. App. 2001)

In the instant case, the defendant proposed several mitigating factors, including the fact that they did not have a criminal record, that they had a good work history, that they loved their children, and that they did not have a sustained intent to violate the law. At the conclusion of the sentencing hearing, the trial court found the following enhancement factors applicable to the defendants' convictions: (4) the victims of the offense were particularly vulnerable because of age or physical or mental disability; and (16), the defendants abused a position of private trust. *See* Tenn. Code Ann. § 40-35-114(4)(16). The trial court noted that it considered the mitigating evidence: namely, that the defendants had no criminal record and had a good work history. However, the trial court found that

-10-

the mitigation evidence carried little weight. The court also found that the defendants lacked any potential for rehabilitation or treatment because they showed no concern for the well-being of their children, they refused to "grow-up," displayed no remorse, lacked empathy, and were completely self-centered. The trial court sentenced the defendants to twenty-five years imprisonment for each Class A felony, and two years for each Class E felony.[4] The court ordered the sentences to run concurrently to each other for an aggregate sentence of twenty-five years' imprisonment to be served at 100 percent.

In brief, the defendants assert that the trial court erred in applying enhancement factor (4), that the victims were particularly vulnerable due to age because the child neglect and aggravated child neglect statutes mandate a higher felony classification based on the age of the victim and as such their Class E and A felony convictions accounted for the victims' vulnerability by imposing the enhanced sentences that accompanied the higher felony classification.

In applying enhancement factor (4), the trial court placed great weight on this enhancement factor and noted the following:

> Little Madison, 11 months old; little Ashley, two years old, they couldn't object to being starved. They couldn't summon help . . . . They couldn't testify. They are at the mercy of the humans that feed them. They couldn't be more helpless. There is nobody more helpless under the law than little Madison and little Ashley. . . .

> Bryson and Katarina, they couldn't object to the conditions of their home. They couldn't object to the conditions of the [rooms] with molded food, spoiled food, soiled diapers, diapers with feces, dried bug cocoons in a pizza box, trash, and other things piled so high you couldn't walk through [the area]. . . . These kids couldn't summon help.

> . . . .

> You know, humans had a difficult time just walking through the house. These kids are 11 months, two years, three years, and five years. The trash and junk was piled everywhere. There was no path to walk and there was . . . nowhere to play, and who are they going to call to help? . . . This is their home; they have nowhere to go. They have no one to turn to; they are at the mercy of their environment and everything else.

Although the age of the victim is an element of the offense of aggravated child abuse (neglect), this does not necessarily preclude the application of this factor. *State v. Walton*, 958 S.W.2d 724, 728 (Tenn. 1997); *State v. Poole*, 945 S.W.2d 93, 96 (Tenn. 1997). Rather, the trial

---

[4] The sentence range for a standard offender convicted of a Class A felony is fifteen to twenty-five years. Tenn. Code Ann. § 40-35-112. The sentence range for a standard offender convicted of a Class E felony is one to two years. *Id*.

court should consider: (1) whether, because of age, the victim was particularly unable to resist the crime, summon help, or testify at a later date; (2) whether the victim's age (extremely young or old) is entitled to additional weight; and (3) whether the vulnerability of the victim made the victim more of a target for the offense or, conversely, whether the offense was committed in such a manner as to render the vulnerability of the victim irrelevant. *Walton*, 958 S.W.2d at 728; *Poole*, 945 S.W.2d at 96-97. Upon review of the record, it is clear that the trial court's findings fall within the aforementioned guidelines. Therefore, we conclude that the application of this enhancement factor was appropriate in this case. *See e.g., State v. Rebecca Curevich*, No. 01C01-9707-CR-00276, 1998 WL 401720, at *5 (Tenn. Crim. App. at Nashville, July 20, 1998) (noting that the victim was "completely unable to resist the lethal does of narcotics administered by the defendant" and "unable to call for help.").

The court also found and placed great weight on enhancement factor (14), that the defendants abused a position of private trust. Referring to both defendants, the court stated in relevant part:

> You are their father and mother, and you all lived together at this residence. . . . As parents, you didn't feed these children. As parents, you didn't attend to their medical needs. As parents, you didn't provide a healthy clean environment. Instead, you allowed your children to live in a sewer . . . and you let them live with mice, roaches, and other insects.

The court also noted that the defendants knew that their children's diets were inadequate and did nothing to remedy the problem.

Proper application of the private trust factor requires that the court examine "the nature of the relationship," and whether that relationship "promoted confidence, reliability, or faith." *State v. Gutierrez*, 5 S.W.3d 641, 646 (Tenn. 1999) (quoting *State v. Kissinger*, 922 S.W.2d 482, 488 (Tenn. 1996)). "A relationship which promotes confidence, reliability, or faith, usually includes a degree of vulnerability." *Id*. It is the exploitation of this vulnerability to achieve the criminal offense which is deemed more blameworthy and thus justifies application of the enhancement factor. *Id*. Here, the record supports the trial court's findings that the defendants abused their position of private trust in purposely neglecting the basic needs of their four children, and therefore, the court did not err in applying this factor.

The record also reflects that the trial court considered the mitigating evidence but gave it little weight. Mere disagreement with how the trial court weighed enhancing and mitigating factors is not an adequate basis for reversing a sentence. *Carter*, 254 S.W.3d at 345-46. The trial court further considered the defendants' amenability to rehabilitation but found that the defendants lacked remorse and were self-centered. Both a lack of candor and an unwillingness to accept full responsibility for one's actions are relevant considerations in determining a defendant's potential for rehabilitation. *State v. Zeolia*, 928 S.W.2d 457, 463 (Tenn. Crim. App. 1996). In sum, we perceive no error in the court's enhancement of the defendants' sentences because the sentences were imposed in compliance

with our sentencing guidelines and adequately supported by the record.  Therefore, the defendants are not entitled to relief on this issue.

## CONCLUSION

Based on the foregoing authorities and reasoning, we affirm the defendants' convictions and sentences.

_____
J.C. McLIN, JUDGE